UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHALEE ANNE WHITE, | ) | Case No. 3:16CV1895 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JEFFREY HELMICK |
| v. | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | <u>REPORT AND RECOMMENDATION</u> |

Plaintiff Chalee Anne White ("White" or "claimant") challenges the final decision of Defendant Commissioner of Social Security ("Commissioner"), denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq*. ("Act"). This court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.

The issue before the court is whether the final decision of the Commissioner is supported by substantial evidence and, therefore, conclusive. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be affirmed.

## I.  PROCEDURAL HISTORY

On May 8, 2013, White protectively filed an application for SSI benefits, alleging disability beginning January 1, 2011.  (R. 10-2, PageID #: 373-382, 370-372, 342-345, 348, 45.)  White listed her physical or mental conditions that limit her ability to work as:  "diabetes, brain disorder, lung removal, manic depression, neuropathy in legs, bipolar."  (R. 10-2, PageID #: 374.)  White's application was denied initially and upon reconsideration.  (R. 10-2, PageID #: 191-209, 165, 210-228.)  Thereafter, White filed a written request for a hearing before an administrative law judge.  (R. 10-2, PageID #: 238-239.)

An Administrative Law Judge ("the ALJ") held a pre-hearing telephone conference on November 19, 2014, at which White was advised of her right to counsel.  (R. 10-2, PageID #: 166-183.)  The ALJ convened the hearing on June 9, 2015.  (R. 10-2, PageID #: 132-163.)  White appeared at the hearing, was represented by counsel, and testified.  (*Id.* at 134-151, 160-161.)  A vocational expert ("VE") also attended the hearing and provided testimony.  (*Id.* at 134, 152-159.)

On June 19, 2015, the ALJ issued his decision, applying the standard five-step sequential analysis to determine whether White was disabled.  (R. 10-2, PageID #: 103-124; *see generally* 20 C.F.R. § 416.920(a).)  Based on his review, the ALJ concluded White was not disabled.  (R. 10-2, PageID #: 103, 124.)

The Appeals Council denied White's request for review, thus rendering the ALJ's decision the final decision of the Commissioner.  (R. 10-2, PageID #: 59-62.)

White now seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).  The parties have completed briefing in this case.

White presents the following legal issues for the court's review:

[1] Whether the [ALJ] erred in his evaluation of treating specialist opinion where he ignores the objective evidence that supports the opinion and fails to apply Social Security's own rules and regulations to the evaluation of the opinion;

[2]  Whether the [ALJ] erred in his evaluation of the opinion of the certified nurse specialist where the [ALJ] fails to provide specific reference to the record, ignores the rationale provided by the practitioner, and claims the opinion is based solely on subjective symptoms; and,

[3]  Whether the [ALJ] erred in his evaluation of subjective symptoms where he fails to consider whether Ms. White's underlying condition could cause the symptoms she experiences, as documented by the treating specialist, and overstates the record to find Ms. White less than credible.

(R. 12, PageID #: 1551.)

## II.  PERSONAL BACKGROUND INFORMATION

White was born on January 21, 1983, and was 30 years old on the application date.  (R. 10-2, PageID #: 137, 122, 370.)  Accordingly, White was considered a "younger person" for Social Security purposes.  *See* 20 C.F.R. § 416.963.  White has a high school education, plus two years of college, and is able to communicate in English.  (R. 10-2, PageID #: 375, 373, 122.)  White had no past relevant work.  (R. 10-2, PageID #: 69-70.)

### III.  RELEVANT MEDICAL EVIDENCE[1]

Disputed issues will be discussed as they arise in White's brief alleging error by the ALJ.  As noted earlier, White applied for SSI on May 8, 2013.  (R. 10-2, PageID #: 45.)  White listed her physical or mental conditions that limit her ability to work as:  "diabetes, brain disorder, lung removal, manic depression, neuropathy in legs, bipolar."  (R. 10-2, PageID #: 374.)

It is uncontested that White has a longstanding history of poorly controlled diabetes mellitus.  (R. 12, PageID #: 1554-1557; R. 15, PageID #: 1584.)  Her treating primary care physician, Hussam Elkambergy, M.D., assessed poorly controlled diabetes mellitus with neuropathy on April 9, 2013.  (R. 10-2, PageID #: 765.)  Dr. Elkambergy adjusted her medications, and referred her to an endocrinologist.  *Id.* at 766.

White was also referred to Certified Nurse Specialist (CNS) Laura Moyer because she wanted to become pregnant and had concerns about the psychotropic medications for her bipolar treatment.  (R. 10-2, PageID #: 763.)  At an April 25, 2013, visit, the mental status exam showed White was able to articulate well with normal coherent speech, her thought content was normal with the ability to apply abstract reasoning, she had the ability to recall recent and remote events, and her attention span and ability to concentrate were normal.  *Id.*  Her mood and affect

---

[1] The summary of relevant medical evidence is not intended to be exhaustive.  It includes only those portions of the record cited by the parties and also deemed relevant by the court to the assignments of error raised.

were normal, and her insight concerning matters relevant to herself was appropriate. *Id.* Moyer assigned a GAF score of 80. *Id.* at 764. White was advised to reduce her medications for the time being. *Id.*

On May 15, 2013, White initiated treatment with the endocrinologist, Ahmad F. Sabbagh, M.D. (R. 10-2, PageID #: 924.) Dr. Sabbagh noted her past compliance with the medical regimen had been sporadic. *Id.* Dr. Sabbagh ordered a new glucometer, and instructed White to test her blood glucose levels five times per day. *Id.* at 925. Later that month, on May 29, 2013, White had a consultation with neurologist William R. Bauer, M.D., regarding right leg pain, and tingling and pain in her right arm. (R. 10-2, PageID #: 799-800.) Dr. Bauer observed decreased sensation in her arms and legs, consistent with diabetic peripheral neuropathy. *Id.* at 800-802. Dr. Bauer ordered an EMG, which was consistent with carpal tunnel and diabetic peripheral neuropathy. *Id.* at 1372.

On August 2, 2013, Anya M. Froelich, Psy.D., conducted a clinical interview with White for a disability evaluation. (R. 10-2, PageID #: 1048-1054.) Dr. Froelich did not review any medical records, but relied solely on the clinical interview. (R. 10-2, PageID #: 1048.) White reported to Dr. Froelich that she had been diagnosed with bipolar disorder. *Id.* White stated that she had been in a residential treatment facility twice, ten years ago for drugs, and four years ago for alcohol. *Id.* at 1050. She reported that she currently attends NA meetings, that she had previously used methamphetamine, but not in the last ten years, and she had not had a drink in the past four years. *Id.*

5

White told Dr. Froelich that her work history was not steady due to the fact that her pregnancies were high risk. (R. 10-2, PageID #: 1050.) She also stated that mood problems had always had a negative impact on her ability to work. *Id.* White also "reported no difficulty understanding directions in a work setting, but stated that there were interpersonal difficulties at work on her 'bad days.'" *Id.* White reported mood swings to Dr. Froelich, and stated that she recently had been diagnosed with bipolar disorder by a psychiatrist in Fremont. *Id.* She described social withdrawal, low motivation, a sense of helplessness, and a history of two suicide attempts. *Id.*

Dr. Froelich diagnosed White with "mood disorder not otherwise specified," and assigned a GAF score of 60, noting moderate symptomology. (R. 10-2, PageID #: 1052-1053.) She noted that "her reported diagnostic history is no[t] quite clear with today's presented symptoms." *Id.* at 1053. Dr. Froelich's functional assessment was unremarkable. *Id.* at 1053-1054. She described no limitations in White's ability to understand, remember, or carry out instructions; or in her ability to maintain attention, concentration, or persistence and pace. *Id.* at 1053. Dr. Froelich noted "some history of interpersonal difficulties in a work setting." *Id.* In describing White's limitations in responding appropriately to work pressure, Dr. Froelich opined that stress and pressure "may" increase White's feelings of depression, that she "may not" cope well with changes, and that she "may" also return to drug or alcohol abuse. *Id.* at 1054.

At an August 14, 2013, follow-up appointment, the progress note indicated that White's compliance with her medical regime had been "sporadic." (R. 10-2, PageID #: 1125.) White reported to Nurse Practitioner Jean Feick that she did not use her glucometer on a regular basis because "she has had this [diabetes] so long that she knows what her sugar is without even checking." *Id.* at 1126. In addition, White reported that she had not been "dosing[2] as prescribed" by Dr. Sabbagh, and she did not really count her carbohydrates, "as she just guesstimates." *Id.*

White had a consultative orthopedic exam with Harold Nims, D.O., on December 5, 2014. (R. 10-2, PageID #: 1390-1398.) She reported that she was diagnosed at age seven with Type I diabetes mellitus that has remained uncontrolled for most of her life. (R. 10-2, PageID #: 1390.) She had an insulin pump inserted eighteen months before the exam, but although her blood sugars had improved they were still not well controlled. *Id.* White reported an estimated one hundred hospitalizations for diabetes complications, most recently two years prior for diabetic ketoacidosis. *Id.*

White also complained of diabetic neuropathy in her arms, hands, feet and legs with pain and intermittent numbness. (R. 10-2, PageID #: 1390.) She was taking gabapentin that helps somewhat. *Id.* She complained of tiredness and fatigue from her disease. *Id.* White also reported a long history of bipolar disorder that is medically treated, and she sees a therapist. *Id.*

---

[2] Meaning, presumably, that White had not been taking the full recommended dosage of her medications.

White claimed that she could walk approximately one block before stopping, can sit for 30 minutes at a time, and stand for 20 minutes at a time.  (R. 10-2, PageID #: 1391.)  She reported to Dr. Nims that she was fired from her most recent job "for missing too much time due to sickness from uncontrolled blood sugars and respiratory illnesses."  *Id.* at 1392.  Dr. Nims observed that White walked with a normal gait, and appeared stable in standing, sitting and supine positions.  *Id.* Examination of White's arms, hands, and legs showed "essentially normal function, strength and range of motion."  *Id.* at 1393-1394.

Dr. Nims opined that White seemed capable of non-strenuous tasks in relatively sedentary environments.  (R. 10-2, PageID #: 1394.)  Based on the physical and functional exams, Dr. Nims reported that White's "ability to perform work-related activities such as bending, stooping, lifting, walking, crawling, squatting, carrying and traveling as well as pushing and pulling heavy objects appears to be not impaired due to the objective findings described [earlier]."  *Id.*

Dr. Nims also completed a medical source statement of White's physical abilities to do work-related activities.  Manual muscle testing showed normal strength in all areas.  (R. 10-2, PageID #: 1395-1396.)  Range of motion was also normal in every area.  *Id.* at 1396-1398.  White was found able to lift and carry up to ten pounds frequently, and up to fifty pounds occasionally.  *Id.* at 1399.  White was capable of sitting, standing and walking for thirty minutes at a time uninterrupted, and was capable of sitting for six hours of an eight-hour work day, of standing for two hours of the workday, and walking for two hours of the workday.

*Id.* at 1400.  Dr. Nims indicated that White could use both hands frequently for reaching overhead, but did not indicate any other limitations for reaching, handling, fingering, feeling, or pushing and pulling with her hands, or for the use of her feet. *Id.* at 1401.

Dr. Nims indicated that White should never climb ladders or scaffolds, balance or crawl as a work-related activity, but she could occasionally climb stairs and ramps, stoop, kneel or crouch.  (R. 10-2, PageID #: 1402.)  White could never be exposed to unprotected heights, or extreme cold or heat, but could occasionally be exposed to humidity and wetness, dust, odor, fumes and pulmonary irritants.  She could frequently operate a motor vehicle, and she could be exposed to moving mechanical parts continuously.  *Id.* at 1403.  Finally, Dr. Nims noted that White had type I uncontrolled diabetes with widely fluctuating blood sugars, which causes problems with tiredness and fatigue.  *Id.* at 1404.

White visited Dr. Bauer for a follow-up appointment on February 20, 2015.  (R. 10-2, PageID #: 1544-1548.)  White reported that her neuropathic pain fluctuated with her diabetes, "which has been under reasonable control."  *Id.* at 1545.  Dr. Bauer did not change her medications, and noted "she is stable at this time and is doing well with her diabetes."  *Id.* at 1547.

Opinion evidence includes a January 6, 2015, medical source statement from Laura Moyer, CNS, concerning the nature and severity of White's mental impairments.  (R. 10-2, PageID #: 1526-1528.)  CNS Moyer opined that White, due to her psychiatric-based symptoms, will be able to remember, understand, and

9

follow directions for simple tasks less than two-thirds of the time, and is able to stay on task less than two-thirds of the time.  (R. 10-2, PageID #: 1526.)  CNS Moyer further opined that White would be unable to perform at an average-paced job without a reduction in productivity of 15-20% compared to an unimpaired worker. *Id.* at 1527.  Also, White would be absent, late, or leave early due to her psychiatric-based symptoms more than once a month on a regular and continuing basis.  *Id.* CNS Moyer noted that it was difficult to estimate productivity reductions, or absences or lateness, due to the nature of bipolar disorder and severe depression. *Id.*

CNS Moyer also stated that, due to her psychiatric-based symptoms, White would be able to tolerate only occasional (up to 1/3 of the work day) superficial interactions with the public, co-workers, or supervisors.  (R. 10-2, PageID #: 1527.) CNS Moyer indicated that the "uncontrollable nature of [White's] bipolar disorder, the unremarkable response to her medications, the need to alter medications, and the unpredictability of her disorder make it highly unlikely that she could successfully maintain  employment on a regular basis." *Id.* at 1528.  CNS Moyer indicated that her treatment relationship began on April 25, 2013, and that she had last seen White on October 28, 2014.  *Id.*

On January 27, 2015, treating endocrinologist Dr. Sabbagh submitted a medical source statement.  (R. 10-2, PageID #: 1538.)  Dr. Sabbagh indicated that uncontrolled or poorly controlled blood sugars "can" contribute to feelings of nausea, lightheadedness, and fatigue.  *Id.*  The doctor also indicated that White's diabetic

condition "could" cause these symptoms at times, affecting her ability to maintain a

regular work schedule.  *Id.*

## IV.  ALJ's DECISION

The ALJ made the following findings of fact and conclusions of law in his

June 19, 2015, decision:

1.  The claimant has not engaged in substantial gainful activity since May 8, 2013, the application date (20 CFR 416.971 *et seq.*).

2.  The claimant has the following severe impairments:  degenerative disc disease with sciatica and back pain; unspecified neuralgia, neuritis, radiculitis; diabetes mellitus with neuropathy; asthma, sinusitis, and allergic rhinitis; status-post left lobe lobectomy; hyperglycemia; and affective disorder (20 CFR 416.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926).

4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in  20 CFR 416.967(b) except:  allowed to sit or stand alternatively, at will, provided that she is not off-task more than 10 percent of the work period; postural limitation of no climbing of ladders, ropes, or scaffolds; occasional use of bilateral lower extremities for operation of foot controls; manipulative limitation of frequent use of the bilateral upper extremities for reaching, handling, and fingering; environmental limitation to avoid all exposure to hazards, such as moving machinery and unprotected heights; additional environmental limitation to avoid moderate exposure to irritants such as fumes, odors, dust, gases, extreme cold, extreme heat, humidity, and wetness.  Work limited to simple, routine, and repetitive tasks in a work environment free from fast paced production requirements, such as moving assembly lines and conveyor belts, involving only work-related decisions, with few, if any, workplace changes; and occasional interaction with the general public, coworkers, and supervisors.

5.  The claimant has no past relevant work (20 CFR 416.965).

6.  The claimant was born on January 21, 1983, and was 30 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.  The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969(a)).

10.  The claimant has not been under a disability, as defined in the Social Security Act, since May 8, 2013, the date the application was filed (20 CFR 416.920(g)).

(R. 10-2, PageID #: 105, 107, 109, 121-122, 124.)


## V.  DISABILITY STANDARD

A claimant is entitled to receive SSI benefits only when she establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381. A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 20 C.F.R. § 416.905(a).

Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability." *See* 20 C.F.R. § 416.920(a); *Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001). The Sixth Circuit has outlined the five steps as follows:

> First, the claimant must demonstrate that he has not engaged in substantial gainful activity during the period of disability. 20 C.F.R. § 404.1520(a)(4)(i). Second, the claimant must show that he suffers from a severe medically determinable physical or mental impairment. *Id.* § 404.1520(a)(4)(ii). Third, if the claimant shows that his impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, he is deemed disabled. *Id.* § 404.1520(a)(4)(iii). Fourth, the ALJ determines whether, based on the claimant's residual functional capacity, the claimant can perform his past relevant work, in which case the claimant is not disabled. *Id.* § 404.1520(a)(4)(iv). Fifth, the ALJ determines whether, based on the claimant's residual functional capacity, as well as his age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled. *Id.* § 404.1520(a)(4)(v).
>
> The claimant bears the burden of proof during the first four steps, but the burden shifts to the Commissioner at step five. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

*Wilson v. Commissioner of Social Security*, 378 F.3d 541, 548 (6th Cir. 2004); *see also* 20 C.F.R. § 416.920(a)(4).

## VI. STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether the ALJ applied the correct legal standards, and whether the findings of the ALJ are supported by substantial evidence. *Blakley v. Comm'r of Social Security*, 581 F.3d 399, 405 (6th Cir. 2009); *Richardson v. Perales*, 402 U.S.

389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence, but less than a preponderance of the evidence. *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003); *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Wright*, 321 F.3d at  614; *Kirk*, 667 F.2d at 535.

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this court would resolve the issues of fact in dispute differently, or substantial evidence also supports the opposite conclusion. *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986). This court may not try the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *Wright*, 321 F.3d at  614; *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). The court, however, may examine all the evidence in the record, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989); *Hubbard v. Commissioner*, No. 11-11140, 2012 WL 883612, at *5 (E.D. Mich Feb. 27, 2012) (quoting *Heston*, 245 F.3d at 535).

VII.  ANALYSIS

A.  Treating Physician

The first legal issue raised by White is whether the ALJ erred in his evaluation of the treating specialist's opinion by ignoring objective evidence that supports the opinion and failing to apply Social Security rules and regulations to the evaluation of the opinion.[3]  (R. 12, PageID #: 1551.)  White argues that the ALJ failed to follow the proper legal criteria, in that he considered only whether to give the treating physician's opinion controlling weight, and failed to fully consider the factors in the regulations concerning the evaluation of such opinion evidence.  (R. 12, PageID #: 1565-1566.)

It is well-recognized that an ALJ must generally give greater deference to the opinions of a claimant's treating physicians than to non-treating physicians. *Gayheart v. Commissioner*, 710 F.3d 365, 375 (6th Cir. 2013); *Blakley*, 581 F.3d at 406; *Wilson*, 378 F.3d at 544.  This doctrine, often referred to as the "treating physician rule," is a reflection of the Social Security Administration's awareness that physicians who have a long-standing treatment relationship with an individual are often equipped to provide a complete picture of the individual's health and treatment history.  *Id.*; 20 C.F.R. § 416.927(c)(2).  The treating physician doctrine

---

[3] Revisions to regulations regarding the evaluation of medical evidence went into effect on March 27, 2017, and purport to apply to the evaluation of opinion evidence for claims filed before March 27, 2017.  82 *Fed. Reg.* 5844-5884 (Jan. 18, 2017). Plaintiff's claim was filed before March 27, 2017, and the ALJ's decision was rendered before the new regulations took effect.  For the sake of consistency, the court continues to cite the language from the former regulations that were in effect at the time of the ALJ's decision.

requires opinions from treating physicians to be given controlling weight where the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in the case record." *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)); *Blakley*, 581 F.3d at 406; *Wilson*, 378 F.3d at 544.  In other words, treating physicians' opinions are only given deference when supported by objective medical evidence. *Vance v. Commissioner*, No. 07-5793, 2008 WL 162942, at *3 (6th Cir. Jan. 15, 2008) (citing *Jones v. Commissioner*, 336 F.3d 469, 477 (6th Cir. 2003)).

Even when a treating source's opinion is not entitled to controlling weight, an ALJ must still determine how much weight to assign to the opinion by applying specific factors set forth in the governing regulations. *Gayheart*, 710 F.3d at 376; 20 C.F.R. § 416.927(c).  Although the ALJ is directed to consider the factors, the ALJ is not required to provide an "exhaustive factor-by-factor analysis" in his decision. *Francis v. Commissioner*, No. 09-6263, 2011 WL 915719, at *3 (6th Cir. March 16, 2011).

Here, the ALJ's decision demonstrates, in weighing Dr. Sabbagh's medical source statement, that the ALJ considered the treatment relationship (R. 10-2, PageID #: 111, 119), implicitly recognized the length (*id.* at 119, reviewing treatment records spanning May 2013 to January 2015), and the nature and extent of the relationship (*Id.* at 111, 119, treating endocrinologist), and addressed the "supportability" of the evidence regarding his opinion.  *See generally* 20 C.F.R. § 416.927(c).  Although the ALJ's decision does not explicitly address the factors, the

decision renders it apparent that the ALJ considered the proper factors in determining how much weight to give to Dr. Sabbagh's statement.  *Francis,* 2011 WL 915719, at *3; *Gayheart,* 710 F.3d at 376; 20 C.F.R. § 416.927(c).

Social Security regulations also require the ALJ to give good reasons for discounting evidence of disability submitted by the treating physician(s).  *Blakley,* 581 F.3d at 406; *Vance,* 2008 WL 162942, at *3.  Those good reasons must be supported by evidence in the case record, and must be sufficiently specific to make clear to subsequent reviewers the weight assigned to the treating physician's opinion, and the reasons for that weight.  *Gayheart,* 710 F.3d at 376; *Blakley,* 581 F.3d at 406-407; *Winning v. Commissioner,* 661 F.Supp.2d 807, 818-819 (N.D. Ohio 2009) (quoting SSR 96-2p).

White argues:  "Where the administrative law judge does not apply the factors specified in the regulations, he has failed to provide good reasons."  (R. 12, PageID #: 1569, citing *Hensley v. Astrue,* 573 F.3d 263, 266-267 (6th Cir. 2009).) White conflates two separate considerations into one.  As set forth in *Hensley* itself, the regulations provide that if a treating physician's opinion is not given controlling weight, "the administrative judge 'must apply' specified factors in determining what weight to give the opinion, <u>and</u> give 'good reasons . . . for the weight we give [claimant's] treating source's opinion.'"  *Hensley,* 573 F.3d at 266-267 (quoting 20 C.F.R. § 404.1527(d)(2)) (emphasis added); *see also* 20 C.F.R. § 416.927(d)(2).  In *Hensley,* the court found that nothing in the regulations suggests an ALJ may decline to give a treating physician's opinion less than controlling weight simply

because another physician has reached a contrary conclusion. *Hensley*, 573 F.3d at 267. The court did <u>not</u> hold that when an ALJ "does not apply the factors specified in the regulations, he has failed to provide good reasons," as argued by White. (R. 12, PageID #: 1569.) In any event, this court finds that the ALJ's decision demonstrates that he considered the relevant factors in reaching his conclusions.

In addition, the ALJ gave good reasons for the weight he assigned to Dr. Sabbagh's medical source statement. The ALJ's decision noted that, although "treating sources are normally accorded greater weight, such opinions must be supported by objective clinical findings or diagnostic studies." (R. 10-2, PageID #: 119.) The ALJ did not give greater weight to Dr. Sabbagh's opinion because it, and Nurse Moyer's opinion, as addressed *infra*, "are not consistent with the totality of the record." *Id.* For example, the ALJ pointed out that Dr. Sabbagh indicated that White's blood sugar levels were not under good control despite her compliance with treatment. (R. 10-2, PageID #: 119, citing PageID #: 1538.) In fact, as the ALJ asserted, White was not compliant with treatment and Dr. Sabbagh's own treatment notes documented her noncompliance. (R. 10-2, PageID #: 119.)

The ALJ relied upon other record evidence documenting noncompliance. (R. 10-2, PageID #: 111, 117.) White presented at a hospital emergency room on June 3, 2012, complaining of illness caused by elevated blood sugars. (R. 10-2, PageID #: 821.) At that time, White had not been taking her insulin as prescribed, and had not been checking her blood sugar levels in over a week. (R. 10-2, PageID #: 111.) The admitting physician, David A. Bodie, M.D., recommended that White follow up

18

with an endocrinologist, and advised her to quit smoking. On discharge, Dr. Bodie noted: "Overall I feel patient will continue to be noncompliant with her type I diabetes and will continue to smoke." (R. 10-2, PageID #: 828.)

Treatment notes indicate that White did not initiate treatment with the endocrinologist, Ahmad F. Sabbagh, M.D., until almost a year later, on May 15, 2013. (R. 10-2, PageID #: 111; *see* PageID #: 924.) The ALJ noted that White did not use her glucometer on a regular basis, contrary to Dr. Sabbagh's recommendation that she check her blood sugar levels four times a day. (R. 10-2, PageID #: 119, citing PageID #: 1125-1126.) At an August 14, 2013, follow-up appointment, it was noted that White's compliance with her medical regime had been "sporadic." (R. 10-2, PageID #: 1125; *see also* PageID #: 117, 1116, 1541.) White reported to Nurse Practitioner Feick that she did not use her glucometer on a regular basis because "she has had this [diabetes] so long that she knows what her sugar is without even checking." *Id.* at 1126. In addition, White reported that she had not been taking her medication as prescribed by Dr. Sabbagh, and she did not really count her carbohydrates, "as she just guesstimates." *Id.*

The ALJ also stated that he did not give greater weight to Dr. Sabbagh's statement because his conclusions were "vague and speculative." (R. 10-2, PageID #: 119, citing PageID #: 1538.) The ALJ noted that Dr. Sabbagh's January 27, 2015, medical source statement used conditional language. *Id.* In completing a form apparently designed by counsel, Dr. Sabbagh circled the word "yes," indicating that uncontrolled or poorly controlled blood sugars "can" contribute to feelings of nausea,

19

light-headedness, and fatigue.  (R. 10-2, PageID #: 1538.)  The doctor also circled

"yes" to the statement that White's diabetic condition "could" cause these symptoms

at times, affecting her ability to maintain a regular work schedule.  *Id.*  The ALJ

found that the medical source statement lacked specificity to make it persuasive,

and it was not consistent with the objective medical evidence or White's activities of

daily living.  (R. 10-2, PageID #: 119-120.)

The Commissioner argues that "Dr. Sabbagh's non-committal agreement with

these theoretical statements does not rise to the level of an opinion as contemplated

by [the regulations]."  (R. 15, PageID #: 1597, citing *Allen v. Commissioner*, 561 F.3d

646, 651 n.3 (6th Cir. 2009).)  The court agrees.

The relevant regulation defines a medical opinion as follows:

> Medical opinions are statements from physicians and psychologists or
> other acceptable medical sources that reflect judgments about the
> nature and severity of your impairment(s), including your symptoms,
> diagnosis and prognosis, what you can still do despite impairment(s),
> and your physical or mental restrictions.

20 C.F.R. § 416.927(a)(2).  A medical "opinion" under the regulations describes not

only the nature and severity of the claimant's impairments, but also what the

claimant is capable of doing despite her impairments, and what her physical or

mental restrictions are in the workplace.  *See* 20 C.F.R. § 416.927(a)(2); *see, e.g.*,

*Dunlap v. Commissioner*, No. 11-5633, 2012 WL 6700319, at *3 (6th Cir. Dec. 27,

2012).

Dr. Sabbagh's medical source statement is not an "opinion" that would

support a finding of disability because the statement does not set forth what the

20

claimant's work limitations are, and what she can do despite her impairments.  *See* 20 C.F.R. § 416.927(a)(2); *Dunlap*, 2012 WL 6700319, at *3; *Allen*, 561 F.3d at 651 n.3 (doctor's statements addressed only general relationship between claimant's condition and symptoms or limitations it may cause, without addressing specific extent of claimant's limitations); *see generally* 20 C.F.R. § 416.912(a), (c) (claimant's burden to furnish medical and other evidence).  The court finds that the ALJ provided good reasons for the weight he gave to Dr. Sabbagh's medical source statement, reasons that are supported by evidence in the record, and are sufficiently specific to make clear the basis for the weight assigned to that statement.  Thus, the court finds that the ALJ's decision concerning Dr. Sabbagh's medical source statement is supported by substantial evidence in the record.

> B.  Nurse Specialist

In the second legal issue, White argues that the ALJ erred in his evaluation of the opinion of the certified nurse specialist Moyer, whose opinion the ALJ considered inconsistent with the totality of the record.  White claims the ALJ erred by failing to provide specific reference to the record, ignoring the rationale provided by the CNS, and characterizing her opinion as based heavily on subjective symptoms.  (R. 12, PageID #: 1551, 1570-1571.)

An ALJ is required to evaluate all medical opinions, regardless of source, unless an opinion is a treating source's opinion entitled to controlling weight. *Walton v. Commissioner*, 187 F.3d 639; 1999 WL 506979, at *2 (6th Cir. 1999) (TABLE, text in WESTLAW) (per curiam); 20 C.F.R. § 416.927(d).  The ALJ must

21

then determine how much weight to give to each opinion.  *Id.*  "If the RFC

assessment conflicts with an opinion from a medical source, the [ALJ] must explain

why the opinion was not adopted."  SSR 96-8p.

A certified nurse specialist, such as CNS Moyer, is not an "acceptable medical

source."  20 C.F.R. § 416.913(a); *see also* SSR 06-3p, 2006 WL 2329939, at *1.  SSR

06-3p[4] discusses the issue as follows:

> The distinction between "acceptable medical sources" and other health
> care providers who are not "acceptable medical sources" is necessary
> for three reasons.  First, we need evidence from "acceptable medical
> sources" to establish the existence of a medically determinable
> impairment.  Second, only "acceptable medical sources" can give us
> medical opinions.  Third, only "acceptable medical sources" can be
> considered treating sources whose medical opinions may be entitled to
> controlling weight.

SSR 06-3p, 2006 WL 2329939, at *2 (internal citations omitted).  Nevertheless,

while information from "other sources" such as a certified nurse specialist cannot

establish the existence of an impairment, "the information may provide insight into

the severity of the impairment," and how it affects the individual's ability to

function.  SSR 06-3p, 2006 WL 2329939, at *2; *Cruse v. Commissioner*, 502 F.3d

532, 541 (6th Cir. 2007); *Reynolds v. Colvin*, No. 1:12CV2994, 2013 WL 5316578, at

*7 (N.D. Ohio Sept. 23, 2013).  Opinions from "other sources" who have seen the

---

[4] As noted earlier, revisions to regulations regarding the evaluation of medical
evidence went into effect on March 27, 2017, and purport to apply to the evaluation
of opinion evidence for claims filed before March 27, 2017.  82 *Fed. Reg.* 5844-5884
(Jan. 18, 2017).  SSR 06-3p is being rescinded.  82 *Fed. Reg.* 5845.  Plaintiff's claim
was filed before March 27, 2017, and the ALJ's decision was rendered before the
new regulations took effect.  For the sake of consistency, the court continues to cite
the language from the former rulings and regulations that were in effect at the time
of the ALJ's decision.

claimant in a professional capacity should be evaluated by considering how long the source has known the claimant, how consistent the source's opinion is with other evidence, and how well the source's opinion is explained. *Cruse*, 502 F.3d at 541. The regulation further provides that the ALJ should explain the weight given to the other source's opinion. 20 C.F.R. § 416.927(e)(2); *Cruse*, 502 F.3d at 541.

The ALJ's decision accorded "little weight" to the opinion of CNS Moyer (R. 10-2, PageID #: 120), after indicating that Moyer –a mental health certified nurse specialist– was not an acceptable medical source. *Id.*, citing 20 C.F.R. § 416.913 and SSR 96-2p. Pursuant to SSR 06-3p, however, the ALJ also acknowledged that, "each case is adjudicated on its own merits based on a consideration of the probative value of the opinion and a weight of all the evidence in that particular case." (R. 10-2, PageID #: 120.) The ALJ, therefore, considered CNS Moyer's treating relationship and "the unique perspective she could bring to the medical evidence." *Id.*

The ALJ's decision further acknowledged CNS Moyer's January 6, 2015, medical source statement. (R. 10-2, PageID #: 120; *see generally* PageID #: 1526-1528.) The statement indicated that the "uncontrollable nature of [White's] bipolar disorder, the unremarkable response to her medications, the need to alter medications, and the unpredictability of her disorder make it highly unlikely that she could successfully maintain[5] employment on a regular basis." (R. 10-2, PageID

---

[5] The ALJ misquoted a word here. The court has substituted "maintain" from the original for the misquoted "maintained." *See* R. 10-2, PageID #: 1528.

23

#: 120, quoting PageID #: 1528.)  Although CNS Moyer's statement constituted an unacceptable opinion concerning an issue reserved to the Commissioner, the ALJ considered her treating relationship and opinion to the extent allowed under the regulations.  *Id.*

The ALJ, for example, found that CNS Moyer's opinion — that White had very serious limitations that would prevent her from staying on task or comprehending instructions even for two-thirds of a workday — lacked substantial support from other evidence in the record, including CNS Moyer's own findings on examination.  (R. 10-2, PageID #: 120.)  White claims the ALJ's decision lacked specific record citations supporting the conclusion that Moyer's opinion was not supported by the totality of the record, but that argument fails to read the ALJ's decision as a whole.  The ALJ's decision earlier discussed CNS Moyer's treatment of White (R. 10-2, PageID #: 115-116), and the ALJ's discussion that her opinion lacked substantial support from the other evidence of record expressly included CNS Moyer's own findings on examination, *id.* at PageID #: 120.  Further, the ALJ asserted that the mental status exam failed to reveal the significant abnormalities and clinical findings one would have expected.  *Id.*  Rather, the ALJ concluded "it appears that Ms. Moyer relied quite heavily on the subjective report of symptoms and limitations provided by the claimant and uncritically accept[ed] as true most, if not all, of what claimant reported."  *Id.*

In addition, the ALJ noted that "treating sources continued to observe stable findings upon mental status examination."  (R. 10-2, PageID #: 115.)  As an

example, the ALJ pointed to an October 31, 2013, appointment with CNS Moyer at which Moyer observed White had the ability to recall recent and remote events, had an intact fund of knowledge, and normal attention span and ability to concentrate. (R. 10-2, PageID #: 115, citing PageID #: 1506.)  White exhibited appropriate insight concerning matters relevant to herself, and appropriate judgment regarding everyday activities and social situations.  *Id.*  The ALJ further acknowledged that "Moyer had stated on various occasions that the claimant was in no acute distress and did not appear to be lethargic, slow, restless or sickly."  *Id.*; *see, e.g.*, PageID #: 1513.

The ALJ also discussed a period when White's medication regimen was adjusted and several follow-up treatment notes showed she "present[ed] as stable." (R. 10-2, PageID #: 115, citing PageID #: 1508, 1513.)  During a September 23, 2014, appointment, White reported transitioning well from Zoloft to Prozac, and that bonding with her newborn continued to go extremely well.  *Id.* at 1515.  CNS Moyer noted White was cooperative, and although depressed, she was not in acute distress. *Id.*  Moyer observed that White articulated well, had the ability to recall recent and remote events, had an intact fund of knowledge, and normal attention span and ability to concentrate.  *Id.*  CNS Moyer again stated that White exhibited appropriate insight concerning matters relevant to herself, and appropriate judgment regarding everyday activities and social situations.  *Id.*

The court finds that the ALJ satisfactorily explained the weight he gave to CNS Moyer's opinion and why he found it was not consistent with other evidence in

the record.  The ALJ's explanation is sufficiently specific to make clear the reason

for the weight assigned.  *See generally* 20 C.F.R. §  416.927(e)(2); *Cruse*, 502 F.3d at

541.  Thus, the court finds that the ALJ's decision concerning CNS Moyer's medical

source statement is supported by substantial evidence in the record.

     C.  Evaluation of Symptoms and Credibility

     White's third legal argument asserts the ALJ erred when evaluating her

subjective symptoms.  The error, according to White, flowed from the ALJ not

considering whether her underlying condition could cause the symptoms she

experiences, as documented by the treating specialist, and overstating the record to

find White less than credible.  (R. 12, PageID #: 1551.)  White more specifically

contends that the ALJ failed "to apply the full test for evaluating subjective

complaints of pain," and thus his decision is not entitled to deference.  (R. 12,

PageID #: 1573, citing *Felisky v. Bowen*, 35 F.3d 1027, 1040-1041 (6th Cir. 1994);

and 20 C.F.R. § 404.1529.)

     The analysis evaluating subjective symptoms begins with whether objective

medical evidence documents a condition reasonably expected to produce the

symptoms alleged.  If the medical signs or laboratory findings show that the

claimant has a medically determinable impairment that could reasonably be

expected to produce her symptoms, the intensity and persistence of the symptoms

must be evaluated to make a determination of how the symptoms limit the

claimant's capacity for work.  20 C.F.R. § 416.929(c)(1); *Luukkonen v.*

*Commissioner*, No. 15-1561, 2016 WL 3426370, at *7 (6th Cir. June 22, 2016);

*Moore v. Commissioner*, No. 13-6654, 2014 WL 3843791, at *1 (6th Cir. Aug. 5, 2014); *Rogers v. Commissioner*, 486 F.3d 234, 247 (6th Cir. 2007).  Although the ALJ may consider statements by medical experts regarding how a particular symptom affects the claimant, "it is the Commissioner's prerogative to determine whether a certain symptom or combination of symptoms renders a claimant unable to work." *Luukkonen*, 2016 WL 3426370, at *7 (citing 20 C.F.R. § 416.929(c)(1); 20 C.F.R. § 416.927(d)(2)).

Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must determine the claimant's credibility based on a consideration of the entire case record.  *Rogers*, 486 F.3d at 247.  To the extent that the ALJ's findings are based on the credibility of the claimant, those findings are accorded great weight and deference. *Walters v. Commissioner*, 127 F.3d 525, 531 (6th Cir. 1997); *Gonzalez v. Commissioner*, No. 1:06CV687, 2008 WL 584927, at *5  (W.D. Mich. Jan. 17, 2008).  The ALJ's credibility determinations, however, must be "based on a consideration of the entire case record," and "must find support in the record." *Rogers*, 486 F.3d at 247-248.

Although White contends the ALJ failed "to apply the full test for evaluating subjective complaints of pain," (R. 12, PageID #: 1573), White's underlying SSI application did not allege disabling pain.  Rather, she listed the physical or mental conditions that limit her ability to work as:  "diabetes, brain disorder, lung removal, manic depression, neuropathy in legs, bipolar."  (R. 10-2, PageID #: 374.)

Nevertheless, the ALJ did find that White's severe impairments included sciatica and back pain, as well as unspecified neuralgia.  (R. 10-2, PageID #: 105.)  However, despite framing the issue as the ALJ's evaluation of "subjective complaints of pain" (R. 12, PageID #: 1573), White's argument does not primarily focus on pain, but rather on other symptoms.

White asserts that she testified to symptoms related to her unstable blood sugars, such as nausea, fatigue, shakiness, and blurred vision.  (R. 12, PageID #: 1573, citing hearing testimony.)  White points out that Dr. Sabbagh's medical source statement noted that uncontrolled or poorly controlled blood sugars contribute to feelings of nausea, lightheadedness, and fatigue, which might cause her to miss work or leave early.  (R. 12, PageID #: 1573, citing PageID #: 1538.)  As discussed above, Dr. Sabbagh's January 2015, medical source statement, although indicating that White's diabetes "can" contribute to certain symptoms, and those symptoms "could" affect her ability to maintain a regular work schedule, is not an "opinion" that would support a finding of disability because it fails to state what in fact White's work limitations are, and what she can do despite her impairments. *See* 20 C.F.R. § 416.927(a)(2); *Dunlap*, 2012 WL 6700319, at *3; *Allen*, 561 F.3d at 651 n.3.

White also notes that the severity of her diabetes is documented in the record by other testing.  (R. 12, PageID #: 1574.)  White argues, for example, that the ALJ failed to mention the June 2013 EMG results (which Dr. Bauer had ordered after he

observed decreased sensation in her arms and legs) that were consistent with diabetic peripheral neuropathy.  (R. 10-2, PageID #: 1372, 800-802.)

The Commissioner responds that any oversight in this regard is harmless, because White has not shown how the ALJ's residual functional capacity restrictions would not accommodate any resulting limitations.[6]  (R. 15, PageID #: 1605, citing R. 10-2, PageID #: 109.)  The Commissioner indicates that after White complained of wrist pain in September 2014, which was treated with an injection, there was no evidence of any follow-up visit for wrist pain.  (R. 15, PageID #: 1605-1606, citing R. 10-2, PageID #: 1502, 1505.)  The Commissioner points to "many other physical examinations performed throughout the period at issue [that] showed generally normal findings not suggestive of significant hand or wrist limitation." (R. 15, PageID #: 1606, citing multiple instances in record).  Other than the September 2014 complaints, which appeared to be attributable to lifting her baby, the Commissioner notes that White "points only to her hearing testimony as evidence of hand/wrist limitation."  (R. 15, PageID #: 1606, citing R. 12, PageID #: 1574.)  White's subjective complaints of her symptoms, as the Commissioner points out, do not alone compel additional restrictions.  (R. 15, PageID #: 1606, citing 20 C.F.R. § 416.929; *Kutscher v. Commissioner*, No. 1:13CV1389, 2014 WL 3895220, at *13 (N.D. Ohio Aug. 8, 2014).)

---

[6] Also, it is claimant's burden to demonstrate that her impairments prevent her from performing substantial gainful employment.  *Walters*, 127 F.3d at 529 (claimant bears burden of proof during first four steps); *see generally* 20 C.F.R. § 416.912(a), (c).

29

White further contends that the ALJ simply failed to consider the record as a whole. (R. 12, PageID #: 1574.) White concludes that the ALJ's "failure to consider the underlying objective evidence of a condition that could cause the pain and other symptoms Ms. White experiences leaves his decision beyond meaningful appellate review," and should be remanded. *Id.* at 1575. The Commissioner responds that the ALJ provided a reasonable evidentiary basis for his assessment of White's subjective reports. (R. 15, PageID #: 1602.) The Commissioner indicates that:

> . . . the ALJ did not totally discount Plaintiff's testimony and allegations regarding how her symptoms affected her ability to perform certain activities, as evinced by the ALJ's limitation to a significantly reduced range of light work with postural, environmental, manipulative, and mental restrictions, as well as an option for Plaintiff to alternate sitting and standing (Tr. 51). This RFC accommodated many of Plaintiff's subjective complaints, including that she could only lift twenty pounds, had some difficulty using her hands, needed to change positions after prolonged periods, and that she experienced anxiety working under pressure or being around strangers (Tr. 81-82, 86-87, 91-92). In fact, the ALJ afforded less weight to the opinion of state agency examining and reviewing physicians, who assessed a range of medium work, because he found that those assessments did not adequately account for Plaintiff's subjective complaints (Tr. 60-61).

(R. 15, PageID #: 1603.) The Commissioner argues that "the ALJ considered a multitude of factors in assessing Plaintiff's subjective allegations, the totality of which provided substantial evidence for the overall credibility assessment." *Id.*

A review of the ALJ's decision demonstrates he considered the entire record before rendering his credibility findings. *See Rogers*, 486 F.3d at 247-248. The ALJ stated that "the description and limitations that the claimant has provided throughout the record has generally been inconsistent and unpersuasive, insofar as the objective findings have been significantly more benign than claimant asserted

30

through her hearing testimony." (R. 10-2, PageID #: 112.)  He added that while White complained that her symptoms have worsened, the objective findings have not changed.  *Id.* at 113.  These conclusions, the ALJ supported with discussion and citations to the record.  *Id.* at 112-113.  For example, the ALJ points out several doctors noted her normal gait, normal sensation in her hands and feet, good muscle tone in all extremities, normal range of motion, and other indications which did not support her allegations of more severe diabetic complications.  *Id.*

In addition, the ALJ noted that treatment has been generally successful in controlling many of her symptoms.  (R. 10-2, PageID #: 112.)  The ALJ identified laboratory findings that demonstrate White's A1C levels[7] were improving, and that, for example, by August 2014 her A1C level had gone down to 7.4 (from 12.8, and it was 7.3 at her December 8, 2014, follow-up visit).  (R. 10-2, PageID #: 112, citing PageID #: 1519.)  The ALJ concluded that the medical record demonstrated White's condition had stabilized.  (R. 10-2, PageID #: 114.)  As a further example, the ALJ referenced a February 20, 2015, follow-up visit with her neurologist, Dr. Bauer, who noted neuropathic pain was stable and found White was "stable at this time and is doing well with her diabetes," and needed no change in her medications.  (R. 10-2, PageID #: 114, 1547.)  Her physicians have recommended that she proceed with only conservative treatment.  *Id.*

---

[7] The A1C test is a blood test that provides information about a person's average levels of blood glucose, also called blood sugar, over the previous three months.  The A1C test is the primary test used for diabetes management and diabetes research.  *See, e.g.*, https://www.niddk.nih.gov/health-information/diabetes/overview/tests-diagnosis/a1c-test.

The court finds that the ALJ's credibility determinations are reasonable, specific, and supported by substantial evidence.  The ALJ identified specific facts supported by the record which cast doubt on the severity of the symptoms and limitations as described by White.  Because "a reasonable mind might accept [the evidence] as adequate to support" his credibility determination, the court concludes that substantial evidence supports the ALJ's finding.  *Norris v. Commissioner*, No. 11-5424, 2012 WL 372986, at *5 (6th Cir. Feb. 7, 2012) (citing *Rogers*, 486 F.3d at 241).

For the foregoing reasons, the court finds that the decision of the Commissioner is supported by substantial evidence.  The record evidence as discussed in the ALJ's decision is such that "a reasonable mind might accept [it] as adequate" support for the Commissioner's final benefits determination.  *See Kirk*, 667 F.2d at 535 (quoting *Richardson*, 402 U.S. at 401).  Accordingly, the undersigned recommends that the decision of the Commissioner be **AFFIRMED**.

Date:  October 2, 2017                       s/ David A. Ruiz
                                             David A. Ruiz
                                             United States Magistrate Judge


OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of mailing of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *see also United States v. Walter*s, 638 F.2d 947 (6th Cir. 1981).

32